No. 23-2842

In the United States Court of Appeals
for the Seventh Circuit

—————————————

PAULA WALLRICH, DANIELLE JONES, GRANT GRINNELL,
JEFFREY BURTON, and RHONDA MCCALLUM,
*Petitioners-Appellees,*

v.

SAMSUNG ELECTRONICS AMERICA, INCORPORATED, and
SAMSUNG ELECTRONICS COMPANY, LIMITED,
*Respondents-Appellants.*

—————————————

On Appeal from the United States District Court
for the Northern District of Illinois
Case No. 1:22-cv-05506 (The Hon. Harry D. Leinenweber)

—————————————

**BRIEF OF AMICI CURIAE PUBLIC JUSTICE, AMERICAN ASSOCIATION
FOR JUSTICE, NATIONAL CONSUMER LAW CENTER, WOODSTOCK
INSTITUTE, AND PUBLIC INVESTORS ADVOCATE BAR ASSOCIATION
IN SUPPORT OF APPELLEES**

—————————————

Shelby Leighton
 *Counsel of Record*
Rohan Shetty
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
Tel: (202) 797-8600
Fax: (202) 232-7203
sleighton@publicjustice.net
rshetty@publicjustice.net

Jeffrey R. White
AMERICAN ASSOCIATION FOR JUSTICE
777 6th Street NW, #200
Washington, DC 20001
(202) 617-5620
jeffrey.white@justice.org

*Counsel for Amici Curiae*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2842

Short Caption: Wallrich v. Samsung Electronics Am., Inc.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
   Public Justice, American Association for Justice, National Consumer Law Center, Woodstock Institute, and Public

   Investors Advocate Bar Association

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
   Public Justice, American Association for Justice

(3)  If the party, amicus or intervenor is a corporation:

   i)  Identify all its parent corporations, if any; and

      N/A

   ii)  list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: /s/Shelby Leighton     Date: 12/18/2023

Attorney's Printed Name:  Shelby Leighton

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes ☑  No ☐

Address:  1620 L St. NW, Suite 630

   Washington, DC 20036

Phone Number:  (202) 797-8600     Fax Number:  (202) 232-7203

E-Mail Address: sleighton@publicjustice.net

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Save As     Clear Form

Appellate Court No: 23-2842

Short Caption: Paula Wallrich, et al v. Samsung Electronics America, Inc., et al

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

   Public Justice; American Association for Justice; Woodstock Institute; National Consumer Law Center

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Public Justice, American Association for Justice

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

       N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

       N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: /s/ Jeffrey R. White    Date: 12/19/2023

Attorney's Printed Name:  Jeffrey R. White

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address: 777 6th Street NW, #200, Washington, DC 20001

Phone Number: (202) 617-5620    Fax Number:

E-Mail Address: jeffrey.white@justice.org

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

INTEREST OF AMICI CURIAE ........................................................................................ 1

INTRODUCTION................................................................................................................ 2

ARGUMENT ....................................................................................................................... 4

I.    LARGE-SCALE INDIVIDUAL ARBITRATION IS A CRITICAL TOOL FOR
      CONSUMERS AND WORKERS WITH NO OTHER LEGAL RECOURSE ...................... 4

   A.    Claim-Aggregation Vehicles are Indispensable to Workers and Consumers.................... 4

   B.    Large-Scale Individual Arbitration is the Only Viable Pathway for Many Consumers and
         Workers........................................................................................................................... 9

II.   SAMSUNG MUST COMPLY WITH THE CONTRACT IT DRAFTED ........................... 11

   A.    Corporate Defendants Cannot Require Arbitration and Then Back out When It No Longer
         Suits Them ..................................................................................................................... 11

   B.    Samsung's Attempts to Escape Its Own Contract Follow a Familiar—But Rejected—
         Playbook ........................................................................................................................ 14

CONCLUSION ..................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Abernathy v. Doordash, Inc.*,
    438 F.Supp.3d 1062 (N.D. Cal. 2020) ...............................................................13, 19

*Adams v. Postmates, Inc.*,
    414 F. Supp. 3d 1246 (N.D. Cal. 2019) ........................................................13, 18, 19

*Amchem Prods. Inc. v. Windsor*,
    521 U.S. 591 (1997) ..........................................................................................................6

*American Express Co. v. Italian Colors Rest.*,
    570 U.S. 228 (2013) ...............................................................................................10, 16

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011) ...............................................................................................10, 16

*Brown v. Dillard's, Inc.*,
    430 F.3d 1004 (9th Cir. 2005) ..............................................................................13, 14

*Carnegie v. Household Int'l, Inc.*,
    376 F.3d 656 (7th Cir. 2004) .......................................................................................5

*Dean Witter Reynolds, Inc. v. Byrd*,
    470 U.S. 213 (1985) .......................................................................................................14

*Epic Sys. Corp. v. Lewis*,
    584 U.S. ----, 138 S.Ct. 1612 (2018) ........................................................................10

*Lamps Plus, Inc. v. Varela*,
    587 U.S. ----, 139 S.Ct. 1407 (2019) ........................................................................10

*Mason v. Costal Credit LLC*,
    No. 3:18-cv-835-J-39MCR, 2018 WL 6620684 (M.D. Fla. 2018)..................12, 13

*Morgan v. Sundance, Inc.*,
    596 U.S. 411 (2022)........................................................................................................14

*Uber Techs., Inc. v. Am. Arbitration Ass'n*,
    204 A.D.3d 506 (N.Y. App. Div. 2022) ...............................................................13, 19

## Other Authorities

Alexander J.S. Colvin, *The Growing Use of Mandatory Arbitration*,
Econ. Pol. Inst. (April 6, 2018), https://www.epi.org/publication/
the-growing-use-of-mandatory-arbitration-access-to-the-courts-is-
now-barred-for-more-than-60-million-american-workers/ ....................................................10

Alexander W. Aiken, Comment, *Class Action Notice in the Digital Age*,
165 U. Penn. L. Rev 968 (2017) ............................................................................17

Alexi Pfeffer-Gillett, *Unfair by Default: Arbitration's Reverse Default Judgment
Problem*, 171 U. Pa. L. Rev. 459 (2023) ...................................................................6

Alison Frankel, *U.S. Chamber Blames Judges, Arbitrators and Lawyers for Mass
Arbitration 'Abuses'*, Reuters (March 2, 2023),
https://www.reuters.com/legal/litigation/us-chamber-blames-judges-
arbitrators-lawyers-mass-arbitration-abuses-2023-03-02/ ...................................................15

Am. Ass'n for Justice, *Forced Arbitration by Corporations Surges to
Unprecedented Levels* (December 2023), (December 2023),
https://www.justice.org/resources/research/forced-arbitration-by-corporations-
surges-to-unprecedented-levels ..............................................................................7

Andrew Wallender, *Uber Settles 'Majority' of Arbitrations for at Least $146M*,
Bloomberg Law, https://bit.ly/3z5E0LD (May 9, 2019) .........................................................9

Brief for Defendant-Respondent,
*Uber Techs., Inc. v. Am. Arbitration Assoc., Inc.*, No. 3782,
2022 WL 1125964, at *39
(N.Y. App. Div. Feb. 2, 2022) ..............................................................................14

Brief of the Chamber of Commerce of the United States of America as Amicus
Curiae in Support of Petitioners, *Am. Express Co. v. Italian Colors
Restaurant*, 570 U.S. 228 (No. 12-133), 2012 WL 6759408............................................15, 16

Christopher R. Leslie, *The Significance of Silence: Collective Action Problems
and Class Action Settlements*, 59 Fla. L. Rev. 71 (2007) .......................................................5

Cynthia Estlund, *The Black Hole of Mandatory Arbitration*,
96 N.C. L. Rev. 679 (2018) .................................................................................7

Daniel Baird Wesson, *Employer-Mandated Arbitration v. The Working Poor*,
Geo. J. on Poverty L. & Policy Blog (March 23, 2020),
https://www.law.georgetown.edu/poverty-journal/blog/employer-mandated-
arbitration-v-the-working-poor/ ..............................................................................8

Edward F. Sherman, *Aggregate Disposition of Related Cases: The Policy Issues*,
10 Rev. Litig. 231 (1991) ............................................................................................6

*The Enforcement Opportunity: From Mass Arbitration to Mass Organizing*,
136 Harv. L. Rev. 1652 (2023) ..................................................................................11

*How Has Mass Arbitration Evolved and Where Is it Going*, Today's General
Counsel (October 2023), https://www.todaysgeneralcounsel.com/how-has-
mass-arbitration-evolved-and-where-is-it-going/ ...................................................20

Hugh Baran & Elisabeth Campbell, *Forced Arbitration Helped Employers Who
Committed Wage Theft Pocket $9.2 Billion in 2019 From Workers in Low-
Paid Jobs*, National Employment Law Project (2021),
https://perma.cc/LB8K-S3QZ ....................................................................................7

J. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev. 1283 (2022) ................................5

Justin Elliott*, TurboTax Maker Intuit Faces Tens of Millions in Fees in a
Groundbreaking Legal Battle Over Consumer Fraud,* ProPublica
(Feb. 23, 2022), https://www.propublica.org/article/turbotax-maker-intuit-
faces-tens-of-millions-in-fees-in-a-groundbreaking-legal-battle-over-
consumer-fraud ...........................................................................................................9

*Justice Restored: Ending Forced Arbitration and Protecting Fundamental Rights*:
*Hearing Before the Subcomm. on Antitrust, Com., & Admin. L. of the H.
Comm. on the Judiciary*, 117th Cong. (2021) ............................................................8

Katherine V.W. Stone & Alexander J.S. Colvin, *The Arbitration Epidemic*,
Econ. Pol. Inst. (Dec. 7, 2015), *available from* https://www.epi.org/
publication/the-arbitration-epidemic/ ........................................................................7

Myriam Gilles, *The Politics of Access: Examining Concerted State/Private
Enforcement Solutions to Class Action Bans*,
86 Fordham L. Rev. 2223 (2018) ...............................................................................5

Nat'l Consumer L. Ctr., Consumer Class Actions § 1.2 (10th ed. 2020),
*available from* www.nclc.org/library ..........................................................................6

Respondent's Opposition to Motion for Temporary Restraining Order,
*Abernathy v. DoorDash, Inc.*,
No. 19-cv-07545 (N.D. Cal. Nov. 22, 2019), ECF No. 35 .....................................18

## INTERESTS OF AMICI CURIAE[1]

Amici are nonprofit organizations dedicated to ensuring access to justice for consumers who are injured by corporate wrongdoing.

Public Justice is a national public interest advocacy organization that specializes in precedent-setting, socially significant civil litigation, with a focus on fighting to preserve access to justice for victims of corporate and governmental misconduct and preserving the civil justice system as an effective tool for holding the powerful accountable. To further its goal of defending access to justice for workers, consumers, and others harmed by corporate wrongdoing, Public Justice has long conducted a special project devoted to fighting abuses of mandatory arbitration, as well as a project devoted to defending the use of claim-aggregation devices like class actions and large-scale individual arbitrations to ensure that consumers and workers with smaller-value claims are able to vindicate their rights.

The American Association for Justice ("AAJ") is a national, voluntary bar association established in 1946 to strengthen the civil justice system, preserve the right to trial by jury, and protect access to the courts for those who have been wrongfully injured. With members in the United States, Canada, and abroad, AAJ is the world's largest plaintiff trial bar. AAJ members primarily represent plaintiffs in personal injury actions, employment rights cases, consumer cases, and other civil actions, including large-scale individual arbitrations. Throughout its 77-year history, AAJ has served as a leading advocate for the right of all Americans to seek legal recourse for wrongful conduct.

---

[1] No party's counsel authored this brief in whole or in part. No party, party's counsel or person–other than amici, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief. Both parties consented to the filing of this brief.

The National Consumer Law Center ("NCLC") is a national research and advocacy organization focusing on justice in consumer financial transactions, especially for low income and elderly consumers. Since its founding as a nonprofit corporation in 1969, NCLC has been a resource center addressing numerous consumer finance issues. NCLC publishes a 21-volume Consumer Credit and Sales Legal Practice Series, including Consumer Arbitration Agreements (8th ed. 2020) and Consumer Class Actions (10th ed. 2020) and actively has been involved in the debate concerning mandatory pre-dispute arbitration clauses, class action waivers and access to justice for consumers. NCLC frequently appears as amicus curiae in consumer law cases before trial and appellate courts throughout the country.

The Woodstock Institute advances economic justice and racial equity within financial systems through research and advocacy at the local, state, and national levels. Woodstock works to restore consumers' access to the courts when harmed by bad actors.

Public Investors Advocate Bar Association ("PIABA") is an international organization of attorneys who advocate on behalf of savers, investors, and retirees in disputes with their financial professionals. Part of PIABA's mission is to protect savers, retail investors, and retirees ("public investors") and create a level playing field for them in securities and commodities disputes. PIABA has appeared as an *amicus curiae* before the United States Supreme Court, Federal Circuit Courts of Appeals, and state supreme courts throughout the nation in cases involving issues important to public investors.

## INTRODUCTION

Samsung drafted and imposed on consumers a contract that banned class actions and required individual arbitration of any claims, so it should have come as no surprise to Samsung that, when thousands of consumers were injured by Samsung's conduct, thousands of consumers

2

brought individual arbitrations. But rather than defend the individual arbitrations it invited, Samsung has simply refused to participate. Now that the district court has compelled it to fulfill its contractual obligations, Samsung appeals to this Court, asking the Court to hold that it can refuse to comply with a contract it drafted simply because it does not like the foreseeable consequences.  To support its position, Samsung and its amici rely on tired attacks on the use of large-scale individual arbitration, none of which has merit.

**First,** Samsung ignores the importance of claim-aggregation vehicles like large-scale individual arbitration as a means for plaintiffs to aggregate their claims and, as a result, make litigation of smaller claims more cost-effective so that consumers can vindicate their statutory rights and deter corporate misconduct. Over the last several decades, corporations like Samsung, along with interest groups like Amicus U.S. Chamber of Commerce, have waged a fight against class actions, obtaining a series of Supreme Court decisions holding that workers and consumers can be forced to prosecute their claims individually in arbitration. As a result, large-scale individual arbitration is often the only choice for consumers who cannot afford to arbitrate their claims alone. Samsung and its amici should not be permitted to foreclose that avenue, too.

**Second**, as other courts have held in similar circumstances, Samsung must comply with the contract it drafted. Indeed, the Federal Arbitration Act (FAA) requires this Court to enforce Samsung's agreement to arbitrate and does not allow Samsung to belatedly choose to go to court at its discretion because arbitration does not suit it. Samsung's excuses for not complying with its own contract follow the same tired playbook that has been rejected by courts before: (1) attack large-scale individual arbitrations as "unethical" or "abusive," (2) raise concerns about "frivolous" or illegitimate claims, and (3) declare that arbitration filing fees amount to a "shakedown" or "extortion." But all three of those tactics fail under even a little scrutiny. Samsung has not pointed

to any ethics violation that has actually occurred in a large-scale individual arbitration, and at the same time it ignores the safeguards in place—even more so in arbitration than in court—to ensure that illegitimate and fraudulent claims are screened out early in the process. Indeed, Amicus U.S. Chamber of Commerce was only recently touting the benefits of large-scale individual arbitration to the Supreme Court. Moreover, in referring to arbitration as a "shakedown," Samsung ignores that the AAA rules allow it to recoup any filing fees paid for claims that are dismissed as frivolous or illegitimate. At the same time, the plaintiff's fee is usually non-refundable, which, combined with the low success rate, makes large-scale individual arbitrations a high-risk endeavor that would be a poor "shakedown" racket.

In short, Samsung has simply not provided any compelling reason why a different rule should apply to it than anyone else who signs a contract: It must do what it agreed to do, which in this case is individually arbitrate any claims brought against it.

## ARGUMENT

## I.    LARGE-SCALE INDIVIDUAL ARBITRATION IS A CRITICAL TOOL FOR CONSUMERS AND WORKERS WITH NO OTHER LEGAL RECOURSE.

Class actions were designed to make claims economically viable, close vast gulfs in resources, and deter corporate misconduct. Owing to the handiwork of large corporations like Samsung and its amici, however, class actions have largely been foreclosed in cases involving consumer and employment contracts. With that important legal tool effectively blunted, large-scale individual arbitrations may well be the only way to achieve those same goals and provide relief for many consumers and workers.

### A.    Claim-Aggregation Vehicles are Indispensable to Workers and Consumers

Large-scale individual arbitrations fall within a tradition of collective action that has long been a central pillar of our nation's civil justice system. Claim-aggregation vehicles—from class-

action lawsuits to multi-district litigation—facilitate claims that would not be cost-effective to bring on their own, and thereby enable consumers and workers to vindicate their rights and hold corporate actors to account for unlawful conduct. In short, without claim aggregation, "the law loses its teeth." Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 Fla. L. Rev. 71, 75 (2007); *see* J. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev. 1283, 1329 (2022) ("Eliminating aggregate claims also tends to eliminate claims generally.").

Claim aggregation is critical for several reasons. First, aggregating claims makes them economically viable. Leslie, *The Significance of Silence*, at 75–76. Many violations of statutory rights—such as wage theft or consumer fraud—result in damages that are significant to an individual but that are dwarfed by the cost of litigation. Myriam Gilles, *The Politics of Access: Examining Concerted State/Private Enforcement Solutions to Class Action Bans*, 86 Fordham L. Rev. 2223, 2224 (2018). Faced with the prospect of expensive litigation or arbitration, many individuals rationally opt to forgo their claims altogether. As Judge Posner once put it, "[t]he *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).

Indeed, the initial filing fee is often enough alone to dissuade workers and consumers with small-dollar claims from bringing a case. *See* Glover, *Mass Arbitration*, at 1329 ("[T]he initial filing fee is the reason that most individual consumer and employment demands, at least if unconnected to a mass arbitration, are never brought."). That is especially so when a defendant refuses to pay, as Samsung did here. In that case, a claimant would need to pay "the entirety of the case initiation fees, which can range from $1,750 to $3,400 and beyond . . . [but] the majority of

Americans do not have enough money on hand to afford even a $1,000 unexpected emergency bill." Alexi Pfeffer-Gillett, *Unfair by Default: Arbitration's Reverse Default Judgment Problem*, 171 U. Pa. L. Rev. 459, 491 (2023).

By spreading costs and raising the ceiling on recovery, large-scale individual arbitration transforms "paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)). Even though large-scale individual arbitrations require the payment of large upfront filing fees, those upfront fees are offset by the increased efficiencies of having one attorney—rather than thousands—represent a large group of individuals and coordinate their litigation strategy, which in turn makes it financially feasible for an attorney to advance the costs of the arbitration on behalf of their clients. *See* Edward F. Sherman, *Aggregate Disposition of Related Cases: The Policy Issues*, 10 Rev. Litig. 231, 236 (1991).

Second, claim aggregation helps bridge stark power imbalances. An individual consumer or worker can rarely, if ever, match the resources of a large, multi-national corporation like Samsung. Indeed, an individual consumer or worker may not even be able to find an attorney to represent them. "No attorney will file a lawsuit for any one person for a wrongful $30 fee a company might charge, but if the company charges one million people that wrongful $30 fee—and the claims can be handled in a single suit—the case starts to look like a matter worthy of attention." Nat'l Consumer L. Ctr., Consumer Class Actions § 1.2 (10th ed. 2020), *available from* www.nclc.org/library.

The data illustrate this resource disparity. By one estimate, if employees covered by forced arbitration agreements filed claims at the same rate as in court, some 320,000 to 727,000 employment arbitration claims would be filed annually — up to 140 times the current rate of about

5,000 arbitrations. Cynthia Estlund, *The Black Hole of Mandatory Arbitration*, 96 N.C. L. Rev. 679, 696 (2018). In other words, a vast majority of workers with legal claims—98% or more—are forced to drop their claims altogether rather than bring them in arbitration. *Id.* Based on that data, forced arbitration allowed employers that committed wage theft to pocket $9.2 billion in 2019 from workers in low-wage jobs. Hugh Baran & Elisabeth Campbell, *Forced Arbitration Helped Employers Who Committed Wage Theft Pocket $9.2 Billion in 2019 From Workers in Low-Paid Jobs*, National Employment Law Project (2021), https://perma.cc/LB8K-S3QZ. And when individuals do manage to initiate arbitration entirely on their own, they seldom prevail. A recent study found that the win rate for consumers and workers in arbitration in 2022 was a mere 0.7%. Am. Ass'n for Justice, *Forced Arbitration by Corporations Surges to Unprecedented Levels*, at 3 (December 2023), https://www.justice.org/resources/research/forced-arbitration-by-corporations-surges-to-unprecedented-levels. Another study found that workers' "economic outcomes are on average 6.1 times better in federal court than in mandatory arbitration ($143,497 versus $23,548) and 13.9 times better in state court than in mandatory arbitration ($328,008 versus $23,548)." Katherine V.W. Stone & Alexander J.S. Colvin, *The Arbitration Epidemic*, Econ. Pol. Inst. (Dec. 7, 2015), *available from* https://www.epi.org/publication/the-arbitration-epidemic/.[2]

---

[2] The U.S. Chamber asserts that consumers and workers benefit from forced arbitration. U.S. Chamber Br. at 23–24. That is incorrect. The Chamber cites a study that they themselves commissioned, but a wealth of independent literature, including those sources cited above, demonstrates that consumers and workers fare better in court than in arbitration proceedings. *See also Justice Restored: Ending Forced Arbitration and Protecting Fundamental Rights*: *Hearing Before the Subcomm. on Antitrust, Com., & Admin. L. of the H. Comm. on the Judiciary*, 117th Cong. (2021) (statement of Myriam Gilles, Professor, Benjamin N. Cardozo School of Law), https://perma.cc/V4YS-YZ2K ("Workers, for example, are less likely to bring their cases in arbitration, less likely to win the cases they do bring, and in the small number of cases they win, tend to be awarded far lower compensatory awards than they would recover in court."). Moreover, the Chamber ignores the claim-suppressing effect of forced arbitration clauses. It is odd to say that individuals recover more in arbitration than in court when the primary effect of forced arbitration clauses is to suppress claims *out of existence*.

Collective action solves for this problem by incentivizing attorneys to represent consumers and workers with small claims and invest resources in their cases. Aggregation enables plaintiffs to attain higher quality legal services and litigate their claims more effectively. *See* Leslie, *The Significance of Silence*, at 76. Large-scale individual arbitration is no exception. Since its advent, potential claimants—many of whom are low-wage workers or resource-strapped consumers—have been able to attract high-caliber attorneys who bring valuable resources to their cause.[3]

Finally, claim aggregation helps deter future corporate misconduct. As described above, individuals often lack the financial wherewithal to challenge corporate malfeasance that inflicts small, identical injuries. "[K]nowing that individuals are unlikely to mobilize, the rational, albeit highly unethical, firm may knowingly engage in illegal conduct that causes dispersed injury, confident that it will not be held accountable." Leslie, *The Significance of Silence*, at 75. In other words, the absence of collective-action vehicles "distorts corporate incentives to do right by their customers, shareholders, and society." *Id.* Claim aggregation helps turn the tide by enabling aggrieved individuals to band together and secure damages awards that both compensate for past harm and reduce the likelihood of future malfeasance. *See* Nat'l Consumer L. Ctr., *Consumer Class Actions* § 1.2 (explaining that class payouts "create[] a financial disincentive for that defendant to engage in wrongful conduct in the future.").

---

[3] Daniel Baird Wesson, *Employer-Mandated Arbitration v. The Working Poor*, Geo. J. on Poverty L. & Policy Blog (March 23, 2020), https://www.law.georgetown.edu/poverty-journal/blog/employer-mandated-arbitration-v-the-working-poor/; J. Maria Glover, *Mass Arbitration*, at 1308–09, 1327.

8

In just the last few years, large-scale individual arbitrations have shed light on practices that deprive workers of fair wages[4] and force taxpayers to overpay for consumer products.[5] Like other claim aggregation vehicles, large-scale individual arbitration "facilitates the disgorgement of ill-gotten gains" and "can render misconduct not cost-beneficial and reduce its occurrence." Leslie, *The Significance of Silence*, at 74. For example, tens of thousands of Uber drivers who brought employment misclassification claims in arbitration secured an estimated payout of between $146 million and $170 million.[6]

### B. Large-Scale Individual Arbitration is the Only Viable Pathway for Many Consumers and Workers.

Large-scale individual arbitration's rapid emergence in the civil justice landscape has been hastened by the steady retrenchment of other claim aggregation vehicles — a retrenchment that large corporations like Samsung and its amici meticulously orchestrated. Through a string of courtroom victories, corporations have undermined class actions and enshrined the power of mandatory individualized arbitration. *See, e.g.*, *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) (FAA preempts state laws that bar class waivers in consumer arbitration agreements); *American Express Co. v. Italian Colors Rest.*, 570 U.S. 228 (2013) (FAA does not permit courts to invalidate contractual waivers of class arbitration on grounds that individual arbitration is cost prohibitive); *Epic Sys. Corp. v. Lewis*, 584 U.S. ----, 138 S.Ct. 1612, 1615 (2018) (FAA requires enforcement of workers' agreements to individually arbitrate their claims, despite statutory right

---

[4] Andrew Wallender, *Uber Settles 'Majority' of Arbitrations for at Least $146M*, Bloomberg Law (May 9, 2019), https://bit.ly/ 3z5E0LD.

[5] Justin Elliott, *TurboTax Maker Intuit Faces Tens of Millions in Fees in a Groundbreaking Legal Battle Over Consumer Fraud*, ProPublica (Feb. 23, 2022), https://www.propublica.org/article/turbotax-maker-intuit-faces-tens-of-millions-in-fees-in-a-groundbreaking-legal-battle-over-consumer-fraud.

[6] Andrew Wallender, *Uber Settles 'Majority' of Arbitrations for at Least $146M*, Bloomberg Law (May 9, 2019), https://bit.ly/ 3z5E0LD.

to concerted action); *Lamps Plus, Inc. v. Varela*, 587 U.S. ----, 139 S.Ct. 1407, 1419 (2019) (courts cannot infer from ambiguous arbitration agreement that parties agreed to arbitrate on class-wide basis).

Today, arbitration agreements with class action waivers touch virtually every American — they are "in employee handbooks, nursing home admissions forms, credit card bills, cell phone statements, insurance contracts, housing leases, job applications, and countless other contracts." J. Maria Glover, *Mass Arbitration*, at 1303. More than 60 million workers are subject to employment contracts with forced arbitration procedures. Alexander J.S. Colvin, *The Growing Use of Mandatory Arbitration*, Econ. Pol. Inst. (April 6, 2018), https://www.epi.org/publication/the-growing-use-of-mandatory-arbitration-access-to-the-courts-is-now-barred-for-more-than-60-million-american-workers/. Further, forced arbitration provisions are more common in low-wage workplaces that are disproportionately composed of minorities and women. *Id.*

Forced arbitration agreements with class-action waivers not only lock workers and consumers out of the courthouse. They also tend to extinguish claims altogether. As described above, claim aggregation is often the only way that bringing a lawsuit would be cost effective. Thus, when workers and consumers are forced by take-it-or-leave-it fine print agreements to waive their right to bring a class action, it usually means they do not bring their claims at all. Indeed, "almost no consumers or employers actually do arbitration. Arbitration clauses suppress claims and thus transform what was a free market for litigation into a *nonexistent* market for arbitration." *The Enforcement Opportunity: From Mass Arbitration to Mass Organizing*, 136 Harv. L. Rev. 1652, 1655–56 (2023).

Given the proliferation of class action bans in arbitration agreements, large-scale individual arbitration is one of the few tools still available to large groups of injured consumers and workers.

To be sure, large-scale individual arbitrations are no panacea. For one, they are costly endeavors, requiring plaintiffs' firms to risk large upfront investments in individual filing fees that are absent in class actions or multi-district litigation. J. Maria Glover, *Mass Arbitration*, at 1330–31. And while large-scale individual arbitrations can breathe life into small dollar-claims, high upfront fees often mean they cannot accommodate the smallest value claims. *Id.* at 1353–54. What is more, large-scale individual arbitrations are often best suited for legal claims with minimal factual variation — and thus leave more fact-intensive claims, such as claims for employment discrimination or sexual harassment, by the wayside.

Still, because corporations have largely managed to push other collective-action vehicles out of the picture, large-scale individual arbitrations are one of the few avenues left for workers and consumers to vindicate their rights and deter corporate wrongdoing. With other paths to recovery effectively blocked off, arbitration's continued viability for large swaths of low-resource workers and consumers might make the difference between corporate impunity and civil justice.

## II.   SAMSUNG MUST COMPLY WITH THE CONTRACT IT DRAFTED

### A.   Corporate Defendants Cannot Require Arbitration and Then Back out When It No Longer Suits Them

Samsung asks this Court to hold that it can have its cake and eat it too: it can use its user agreements to force consumers into individual arbitration, but then, once there, it alone can decide whether it would rather proceed in arbitration or go to court by refusing to participate in the arbitration. That would have the effect of flipping the usual court procedures—which generally punish litigants who do not follow the rules—on their head. In court, when a plaintiff files a complaint and pays the initial filing fee, the case is docketed, a judge is assigned, and the defendant must respond to the complaint. If the defendant fails to respond, it risks entry of a default judgment.

But in arbitration, the plaintiff's filing of a complaint and payment of the initial non-refundable filing fee is insufficient to start the case. The defendant must also pay its share of the fees before the case is docketed and an arbitrator assigned. Here, Samsung asks the court to adopt a rule that would allow defendants to manipulate that procedure by *never* paying their share of the fee or responding to the complaint in arbitration at all. And rather than the defendant facing a default judgment—or any negative consequences—from its failure to respond to the plaintiff's suit, it is the *plaintiff* who would have their case dismissed. In Samsung's preferred world, defendants who don't play by the rules get exactly what they want—delaying the case and increasing the cost to the plaintiff—while the plaintiff must expend additional time and money just to start at square one. *See Mason v. Costal Credit LLC*, No. 3:18-cv-835-J-39MCR, 2018 WL 6620684, at *2 (M.D. Fla. 2018) (describing how defendant achieved more than a year-long delay by moving to compel arbitration and then, when the case was filed in arbitration, refusing to pay the required fee, forcing the plaintiff to re-file in court, and then filing *another* motion to compel arbitration).

The rule sought by Samsung would be bad enough if plaintiffs chose arbitration in the first place, but, in reality, it is almost always the corporate defendant that has forced arbitration on the worker or consumer. Indeed, it is not uncommon for a defendant to refuse to pay arbitration fees even after winning a motion to compel the plaintiff into arbitration. *See, e.g.*, *Mason*, 2018 WL 6620684, at *2. Here, if Samsung wanted to settle disputes in court (as it now claims to), it could simply have not included an arbitration provision in its user agreement. But what Samsung and other corporate defendants really want is the option to choose the forum most advantageous to them in each case, or, even worse, preclude injured consumers from bringing claims in any forum. Indeed, if Samsung had its way, it would give a green light for corporations to force plaintiffs into months or even years of delays and costs—first paying to file an action in court and defending

against a motion to compel arbitration, then paying the fee and filing in arbitration, and then being forced to re-file again in court if the defendant fails to pay the fee. *See, e.g.*, *Mason*, 2018 WL 6620684, at *2; *see also Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1009 (9th Cir. 2005) (employer moved to compel arbitration again after employee filed claims in court because employer had refused to pay required fee in arbitration). Corporate defendants know that, rather than pursue the expensive and labyrinthine process of bouncing between court and arbitration, "plaintiffs are more likely to simply abandon their claims, resulting in a victory for unresponsive defendants." Pfeffer-Gillet, *Unfair by Default*, at 466.

As other courts have recognized, Samsung's position that its class action ban should apply when aggregate litigation is more efficient for consumers but not when aggregate litigation is more efficient for Samsung is pure "hypocrisy." *Abernathy v. Doordash, Inc.*, 438 F.Supp.3d 1062, 1068 (N.D. Cal. 2020). The filing fees that Samsung is faced with in this case "are a direct result of the mandatory arbitration clause and class action waiver that [Samsung] has imposed on each of its [consumers]." *Adams v. Postmates, Inc.*, 414 F. Supp. 3d 1246, 1250, 1252 n.2 (N.D. Cal. 2019), *aff'd*, 823 F. App'x 535 (9th Cir. 2020); *see also, e.g.*, *Uber Techs., Inc. v. Am. Arbitration Ass'n*, 204 A.D.3d 506, 509 (N.Y. App. Div. 2022) (company had "made the business decision to preclude class, collective, or representative claims in its arbitration agreement with its consumers, and AAA's fees are directly attributable to that decision"); *cf. Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1006 (9th Cir. 2005) ("[W]e hold that [defendant-employer] cannot compel [plaintiff-employee] to honor an arbitration agreement of which it is itself in material breach."). Having made the decision to require resolution of all disputes—no matter how many consumers are affected—by individual arbitration, Samsung is stuck with the consequences.

13

But letting Samsung out of an arbitration agreement that it drafted is not just bad policy: it also violates the FAA, which requires that "a court hold a party to its arbitration contract." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022). As the Supreme Court has long held, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). As a result, "agreements to arbitrate must be enforced," absent a contractual basis for invalidating the agreement. *Id.* at 219. There is no exception to that rule when the party seeking to get out of the agreement is the company who wrote it. Indeed, if anything, the agreement should be more strictly enforced against the company that drafted it. As the AAA itself has eloquently put it, a company like Samsung "is not an individual consumer in need of protection, but rather is a sophisticated, multibillion-dollar commercial entity that made a deliberate business decision to require its customers to resolve disputes through individual arbitrations." Brief for Defendant-Respondent, *Uber Techs., Inc. v. Am. Arbitration Assoc., Inc.*, No. 3782, 2022 WL 1125964, at \*39 (N.Y.A.S. 1 Dep't Feb. 2, 2022). Samsung is stuck with that decision.

In short, Samsung seeks a ruling that it does not have to comply with an arbitration agreement that it drafted, despite the fundamental mandate of the FAA that courts enforce arbitration agreements as written. Like courts before it, this Court should reject that hypocrisy and compel Samsung to arbitrate as it agreed to do.

### B.     Samsung's Attempts to Escape Its Own Contract Follow a Familiar—But Rejected—Playbook

Samsung attempts to escape its own contract by using the same playbook that other companies have used in similar situations—and that courts have just as routinely rejected: (1)

14

attack large-scale individual arbitrations as "unethical" or abusive, (2) raise concerns about "frivolous" or illegitimate claims, and (3) declare that arbitration filing fees amount to a "shakedown" or "extortion." Samsung's brief is a case study in all three attacks, but just as in other cases in which the playbook has been tried, all three fail.

**First**, despite the parade of horribles described in their briefs, Samsung's amici do not point to even one case concluding that attorneys violated their professional responsibilities in large-scale individual arbitration. That is because none exist. *See* Alison Frankel, *U.S. Chamber Blames Judges, Arbitrators and Lawyers for Mass Arbitration 'Abuses'*, Reuters (March 2, 2023), https://www.reuters.com/legal/litigation/us-chamber-blames-judges-arbitrators-lawyers-mass-arbitration-abuses-2023-03-02/ (quoting a leading scholar on large-scale arbitration, Professor J. Maria Glover, who stated "she is not aware of any case in which a court or arbitrator has concluded that a plaintiffs' firm committed systemic ethical breaches by conducting a mass arbitration campaign.").

Amici's specific attacks on the use of technology to assist attorneys in managing the case as "abusive" and "misleading" fare no better. U.S. Chamber Br. at 31; Retail Litigation Center Br. at 9. Indeed, not so long ago, the U.S. Chamber *extolled* the benefits of technology in large-scale individual arbitrations. In *American Express Co. v. Italian Colors Restaurant*, it argued to the Supreme Court at length that plaintiffs had no need for class actions because they could vindicate their rights and reduce costs through technology-powered large-scale individual arbitrations. Brief of the Chamber of Commerce of the United States of America as Amicus Curiae in Support of Petitioners, *Am. Express Co. v. Italian Colors Restaurant*, No. 12-133, 2012 WL 6759408, at *27-30 (2012).

The Chamber—represented by the same counsel that represents it as amicus here and that represented AT&T before the Supreme Court in *Concepcion*—explained that plaintiffs' lawyers, "could easily identify and solicit large numbers of similarly situated [claimants] to file individual [arbitration] claims across which litigation costs can be spread." *Id.* at \*27. The Chamber described positive developments along these lines — lauding that "some plaintiffs' lawyers are beginning to recognize that pursuing serial individual arbitrations (or small-claims actions) can be an economically viable business model—especially in view of the ability to reach multiple similarly situated individuals by means of websites and social media." *Id.* at \*29. The Chamber praised one attorney who "filed separate demands for arbitration on behalf of over 1,000 claimants—each making virtually identical allegations and relying on the same expert witness whom [the attorney] had proffered in support of his class-action lawsuit." *Id.*

For the Chamber, "[t]hese examples demonstrate that, especially in an era in which the Internet and social media can be used effectively to reach out to potential claimants, individual plaintiffs (and their counsel) can readily identify other businesses or individuals with similar claims who can share the in the costs of pursuing claims." *Id.* at \*30.

The Chamber's about-face before this Court is, at best, curious and, at worst, cynical. In any event, the Chamber had it right in *Italian Colors*: by allowing claimants to "pool resources and share common costs," technology makes arbitration more — not less — effective. *Id.* at \*26.

Moreover, for the reasons identified by the Chamber, technology is also a mainstay in class-action cases. For example, courts routinely permit class-action settlement notices to be disseminated by various digital means to reach the largest number of class members possible— including "banner and pop-up advertisements, keyword search results, and dedicated websites." Alexander W. Aiken, Comment, *Class Action Notice in the Digital Age*, 165 U. Penn. L. Rev 968,

984 (2017). In short, far from enabling ethical violations, technology has vastly expanded access to justice for low-wage workers and consumers.

**Second**, the attacks by Samsung and its amici on claimants' legitimacy are unfounded. *See* Samsung Br. at 23; Retail Litigation Center at 7; U.S. Chamber Br. at 35. To begin with, Samsung's speculations about claimants—even if true—would almost all be irrelevant to whether the claimants had Samsung devices or BIPA claims. For example, Samsung suggested that some claimants had participated in what it viewed as too many cases against large companies, making them "serial" litigants. 5-SA 1252. But a claimant's past use of the legal system to vindicate their rights has no bearing on whether they may also have claims against Samsung here.[7]

In any event, in this case, verification procedures *were* employed. In response to Samsung's concerns, the AAA independently vetted claimant's submissions and directed claimants to cure outstanding issues. 5-SA1266–67. Claimants did so, submitting a revised spreadsheet of claimant information and providing a substantive response to Samsung's concerns. Wallrich Response Br. at 14. The AAA then determined which claimants had satisfied their filing requirements and allowed most claimants to proceed. 5-SA1269–70. Samsung still refused to pay its share of filing fees as to those claimants who were verified by the AAA. *Id.* at 14–15.

What is more, the AAA's Supplementary Rules for Multiple Case filings allow Samsung to raise any verification issues—such as the presence of improper claimants—to a "Process Arbitrator" before any arbitration. 5-SA1260. The AAA informed Samsung of this opportunity. 5-SA1269. Samsung declined to use it. It does not, then, appear that large-scale individualized

---

[7] The same could be said of Samsung's other objections. Samsung suggested there are claimants who are deceased. 5-SA1252. But all that would mean is that a claimant's estate might have a BIPA claim. Samsung also suggested that there are claimants who are not Illinois residents. But that presumes that those claimants were not — in the past — Illinois residents who might therefore have colorable BIPA claims.

17

arbitrations lack a "gatekeeper," Retail Litigation Center Br. at 7, or encourage "fraud" because "neither claims administrators nor courts are policing" claimant information. U.S. Chamber Br. at 35. Instead, the explanation seems much simpler: Samsung did not like the gatekeeper's determinations, so it decided to ignore those determinations altogether.

**Third**, Samsung and its amici are wrong that large-scale individualized arbitrations are vehicles for "abusive gamesmanship" or "exortion[]." U.S. Chamber Br. at 25. Indeed, Samsung's attacks on Claimants' lawyers mirror the exact same attacks of other companies—down to the very word. For example, Samsung calls claimants' requests for arbitrations a "shake down." Samsung Br. 1. So did Doordash. *Abernathy v. DoorDash, Inc.*, No. 19-cv-07545 (N.D. Cal. Nov. 22, 2019), ECF No. 35 (describing arbitration requests as a "shakedown scheme"). So did Postmates. Respondent Postmates Inc.'s Opposition to Petitioners' Motion to Compel Arbitration at 1, *Adams v. Postmates, Inc*., 414 F. Supp. 3d 1246 (N.D. Cal. 2019) (No. 19-cv-03042), 2019 WL 11093949, ECF No. 112 ("This is a shakedown Respondent DoorDash, Inc.'s Opposition to Motion for Temporary Restraining Order at 2–3,."). Uber said much the same. J. Maria Glover, *Mass Arbitration*, at 1344 n. 322. Yet, no court agreed, instead holding that what was improper was the companies' attempt to try to play by different rules than the ones they imposed on their workers and customers. *See, e.g.*, *Uber Techs.*, 204 A.D.3d at 509; *Abernathy*, 438 F. Supp. 3d at 1068 (N.D. Cal. 2020); *Adams*, 414 F. Supp. 3d at 1250, 1252 n.2.

Moreover, amici for Samsung ignore the realities of large-scale individualized arbitration. To begin—and most important—the AAA rules contain backstops against runaway filing fees that may result from "frivolous" claims. Samsung Br. at 1. As described above, *before* any merits arbitration, Samsung could have requested a "Process Arbitrator" to weed out any supposed illegitimate claimants and recover associated filing fees. 5-SA1260–61. If that weren't enough,

Samsung would also be entitled to recover filing fees after any merits arbitration if any claims were found to constitute "harassment" or to be "patently frivolous." 5-SA1192 (R-44(c)). These rules undercut hyperbolic assertions about "blackmail settlements" and "*in terrorem* settlement pressure," but amici for Samsung pretend they don't exist. *See* U.S. Chamber Br. at 28; Retail Litigation Center Br. at 8.

Further, large-scale individual arbitrations are high-risk undertakings. They often require millions in upfront costs, with little guarantee of a back-end payout. J. Maria Glover, *Mass Arbitration*, at 1328. There are rarely "quick and lucrative settlements." U.S. Chamber Br. at 29. For instance, in 2022 less than 0.2% of consumers in large-scale individual arbitration received a monetary award. Am. Ass'n for Justice, *Forced Arbitration by Corporations Surges to Unprecedented Levels*, at 4. That is hardly is a "shakedown."

Amici for Samsung throw out numbers that are unrelated to the facts of this case. U.S. Chamber Br. at 28 (warning about filing fees "well over $200 million").  It is strange to say that $4 million in filing fees—which is what the AAA determined Samsung was responsible for in this case—amounts to a "shakedown." Samsung is a multi-billion-dollar corporation with a market cap of more than $200 billion.[8] The filing fees here amount to less than 0.002% of Samsung's value.[9] That sort of leverage is a far cry from "coerc[ion]." U.S. Chamber Br. at 28.

In short, the arbitration fees in this case are anything but an ambush. AAA fees are a matter of public record, and Samsung specifically chose AAA to administer arbitrations initiated under

---

[8] https://ycharts.com/companies/SSNLF/market_cap.

[9] By contrast, most consumers and workers can barely afford to pay even the hundreds of dollars of filing fees required. Pfeffer-Gillett, *Unfair by Default*, at 491.

its user agreement. Large-scale individual arbitrations are not new.[10] And the fees are directly attributable to Samsung's considered business decision to preclude virtually every other form of aggregate litigation and instead provide for individual arbitration. It is not "extortion" to hold companies to the terms of agreements they themselves drafted.

## CONCLUSION

For the foregoing reasons, amici respectfully request that the Court affirm the district court's Order compelling arbitration.

Respectfully submitted,

Dated: December 19, 2023

/s/ *Shelby Leighton*
Shelby Leighton
  *Counsel of Record*
Rohan Shetty
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
Tel: (202) 797-8600
Fax: (202) 232-7203
sleighton@publicjustice.net
rshetty@publicjustice.net

Jeffrey R. White
AMERICAN ASSOCIATION FOR JUSTICE
777 6th Street NW, #200
Washington, DC 20001
(202) 617-5620
jeffrey.white@justice.org

*Counsel for Amici Curiae*

---

[10] *How Has Mass Arbitration Evolved and Where Is it Going*, Today's General Counsel (October 2023),https://www.todaysgeneralcounsel.com/how-has-mass-arbitration-evolved-and-where-is-it-going/ ("The AAA has a long history of administering large-scale individual cases. They include insurance-related disputes, disputes arising from financial crises like the Great Recession as well as cases related to asbestos-related personal injuries.").

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Circuit Rule 29 because this brief contains 6,051 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as calculated by Microsoft Word 2016. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a) and Circuit Rule 32(b) because this brief has been prepared in proportionally spaced typeface using 12-point Times New Roman font.

December 19, 2023                      /s/ *Shelby Leighton*
                                            Shelby Leighton

**CERTIFICATE OF SERVICE**

I certify that on December 19, 2023, I electronically filed the foregoing Brief of Amici Curiae via the CM/ECF system and served all parties or counsel via CM/ECF.

December 19, 2023                                    /s/ *Shelby Leighton*
                                                     Shelby Leighton